STATE of Iowa, Appellee,

v.

Jack McCLELLAND, Appellant.

No. 52825.

Supreme Court of Iowa.

Jan. 14, 1969.

See also, Iowa, 162 N.W.2d 457.

Harold G. DeKay, Atlantic, for appellant.

Richard C. Turner, Atty. Gen., James C. Sell, Asst. Atty. Gen., and William W. Don Carlos, County Atty., for appellee.

MOORE, Justice.

On February 8, 1967 defendant, Jack Mc-Clelland, was indicted by the Adair County Grand Jury for breaking and entering with intent to commit a public offense, to wit: larceny, contrary to section 708.8, Code, 1966. On trial a jury verdict of guilty was returned. Thereafter he was sentenced to a term not to exceed ten years in the Men's Reformatory at Anamosa and has appealed. We affirm.

Between 1:30 and 2:00 a. m. December 19, 1966 Donald Carrick, Adair night marshal, observed an unfamiliar automobile emerge from an alley going west and then turn north onto Fifth Avenue. The vehicle proceeded north a block then turned east down Audubon Avenue. His suspicions caused him to get into his patrol car to investigate. When he reached Fourth and Audubon he saw the unfamiliar car stopped about a half block south on Fourth with its hood raised. It was stopped near the east entrance of Bruce Supply Store which is on the southwest corner of Fourth and Audubon in Adair.

The car's only occupant, Mike Chafa, told Carrick he was having generator and battery trouble. Carrick pushed the car with his patrol car and it started. As Chafa drove away Carrick took the car's Nebraska license number.

Carrick then began checking door locks in the area to determine if they were all secure. While so doing, he observed defend-

ant walking down the street about 100 feet south of the east entrance to Bruce Supply. He shouted at defendant to stop and as Carrick reached defendant he noticed a large screwdriver between defendant's trousers and his person. Carrick then told defendant he did not have to say anything and took him to a nearby service station where Carrick briefly frisked him. Nothing was then taken from defendant. The highway patrol and sheriff's office were then notified of the arrest.

Very soon thereafter highway patrolman, Richard Curd, arrived and advised defendant he was being held on suspicion of breaking and entering and that he had a right to make a phone call, had an immediate right to an attorney, a right to remain silent, and anything he said could and would be used against him. Curd, however, did not inform defendant he had a right to appointed counsel if he could not afford one.

Curd then asked him why he had broken into the store and defendant replied he hadn't really broken into it, but had just pried the door open. Curd then left in response to another unrelated police call.

About 2:30 a. m. when Carrick was about to leave defendant in the custody of a deputy marshal and to resume his security check of local business establishments, defendant stated he would find an east door broken into. Carrick's investigation disclosed the east door to Bruce Supply had been forced open and the latch broken. Fresh pry marks were observed in the wood near the latch. Inside he observed a pile of slivers or wood chips in front of an old wooden cash register along with pry marks on the cash drawer. The attempts to pry open the drawer had been unsuccessful. Ironically the drawer which contained a small amount of money was unlocked and could easily have been opened by pressing the proper button on the face of the register.

Upon his return to the service station Carrick was told by defendant he was in the store when Carrick pushed Chafa's car and

that he thought Carrick had seen him inside. Defendant then, in the presence of Curd and Carrick, removed a pry bar which he had hidden under his clothes.

A few minutes later sheriff Don Foster and his deputy, Malcom Herrick, arrived at the station. The sheriff then read to defendant, from a prepared form card, his Miranda rights which stated: "You have a right to remain silent; anything you say can and will be used against you in a court of law; you have the right to talk to a lawyer and have him present with you while you are being questioned; if you cannot afford to hire a lawyer one will be appointed to represent you before any questions, if you wish one." The reverse side of the card bore two questions relative to a knowing and intelligent waiver of the Miranda rights. These were also read to defendant. Defendant then stated he did not wish to answer any questions and accordingly no questions were asked of him. After handcuffing defendant the sheriff and Herrick departed to investigate an unrelated report of violence in another part of the county.

About 5:30 a. m. sheriff Foster and his deputy Herrick returned to the service station where defendant and Mike Chafa, who had been recently apprehended, were being held. Highway patrolman, John Novy, had arrived at the station a short time before the sheriff's return. At the sheriff's request the two suspects were placed in a patrol car and taken by Novy and Herrick to the jail in the nearby town of Greenfield. Defendant sat in the front seat next to Novy, and Chafa in the rear with Herrick.

On the way to Greenfield, which took less than thirty minutes, Novy asked defendant what had happened in Adair. Novy was not present when the sheriff gave defendant the Miranda warnings. Defendant answered he had broken into Bruce Supply and was inside when he saw the marshal's car pass by and stop by Chafa's. Thinking the marshal had seen him in the store he left as soon as the marshal's car was out of

sight. At trial, Herrick testified he had not heard this conversation.

When they arrived at the Greenfield jail Herrick, before booking him, again read defendant the Miranda warnings and then asked him his name, address and occupation. He also asked him what had happened earlier in Adair. Defendant willingly related substantially the same story he had told Novy.

Before trial defendant filed a motion to suppress all evidence of claimed statements of defendant to Carrick, Curd, Novy and Herrick on the grounds he had not been adequately informed of his rights before said alleged statements and had stated he did not wish to answer any questions.

On hearing of the motion to suppress the claimed statements of defendant were brought to the trial court's attention. Defendant testified he had not been advised by Carrick that an attorney would be appointed if he could not afford one. He admitted sheriff Foster had read him the Miranda warnings but he could not remember Herrick later doing so. He denied making any of the claimed admissions to any of the officers.

The trial court ruled the claimed statements made to Carrick and Curd were inadmissible on the ground defendant had not been adequately informed of his rights before he made them. On trial Carrick and Curd did not testify regarding these claimed statements.

The court overruled defendant's motion to suppress the claimed statements of defendant to Novy and Herrick. The trial court found they were made after defendant had been given ample notice of his constitutional rights by sheriff Foster, there was no evidence they were coerced or induced as the result of any promises or threats of any kind and were voluntarily made by defendant. Novy and Herrick testified on trial, over defendant's objections, regarding defendant's statements to them.

I. Initially, defendant challenges the propriety of submitting to the jury his admissions to Novy and Herrick urging this was violative of his constitutional rights under the holding in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974. The prepared card read to defendant by the sheriff includes the required prerequisite warnings under Miranda which must be given to establish admissibility of admissions obtained from an accused during custodial police interrogation. Defendant argues his statements to Novy and Herrick were involuntary and did not result from a knowing and intelligent waiver of his rights.

In Miranda, pages 473, 474, 384 U.S., page 1627, 86 S.Ct., page 723, 16 L.Ed.2d, the majority opinion states: "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. * * *."

At page 475, 384 U.S., page 1628, 86 S.Ct., page 724, 16 L.Ed.2d, the court quotes this from Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70, 77: "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver."

At page 478, 384 U.S., page 1630, 86 S. Ct., page 726, 16 L.Ed.2d, the court states: "In dealing with statements obtained through interrogation, we do not purport

to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. * * * Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

The essence of defendant's contention, as we are able to understand it from the rather disjointed and rambling assignments of error, some of which are not argued, is that once defendant has stated he wishes not to answer questions, any information by subsequent conversation, regardless of whether or not prefaced by Miranda warnings, is inadmissible on the ground it necessarily results from a type of compulsion, at least in the absence of counsel.

It is at once apparent the inevitable consequence of such a holding would be an ironclad rule prohibiting police officers from subsequently inquiring of a defendant who has invoked his right to silence whether he wishes at any time to waive that right. Certainly a defendant has a right to reconsider and change his decision in the matter. We do not believe Miranda goes so far as to exclude all answers to questions put to defendants after they have claimed their right to remain silent. This is particularly true under a record, as here, which is clearly demonstrative of the wholly voluntary nature of the given response. To hold otherwise would overlook the realities of efficient and practical criminal investigation.

Defendant does not claim there were any threats, promises, coercion or physical abuse inflicted upon him. The record is void of any ill-treatment, lengthy custodial interrogation, overreaching, or any showing defendant was mentally deficient or unable to appreciate the circumstances in which he found himself. Although advised of his rights to have an attorney present and to make a telephone call, the record discloses no attempt to exercise either of these known rights or that the authorities would have refused either request had he desired to exercise them. When defendant stated to sheriff Foster he did not wish to answer any further questions, no further interrogation was conducted by him. No further mention of the evening's events was made to defendant until over two hours later when he was enroute to jail.

From the foregoing it is obvious we are not here confronted with any of the salient features present in Miranda—incommunicado interrogation of a person in a police dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights.

In accordance with the procedure we approved in State v. Holland, 258 Iowa 206, 138 N.W.2d 86, the trial court held an evidentiary hearing as to the admissibility of all incriminating statements made by defendent to officers Novy and Herrick and as we have already pointed out found them to be voluntary and admissible. These statements were thereafter received in evidence over defendant's objection at trial. A cautionary instruction was given the jury on the question of the credit, if any, to be given them. Defendant asserts no error in this regard.

Our research has not disclosed a case exactly identical on the facts, although the same contention has been urged recently under substantially similar conditions in other jurisdictions so as to make comparisons helpful.

In Jennings v. United States, 5 Cir., 391 F.2d 512, defendant was arrested by a local police officer upon suspicion of interstate transportation of a stolen vehicle. Upon arrival at the police station the officer advised defendant of his constitutional rights and then asked him a few questions to which the suspect readily replied. He then changed his mind announcing he would not answer further questions. The interrogation immediately stopped. About an hour later an F.B.I. agent came to the station, gave defendant the Miranda warn-

ings, and proceeded to interrogate him. Defendant willingly signed a waiver and did not hesitate to discuss the matter. Defendant did not tell the agent, nor did he know, defendant had previously invoked his right to remain silent.

On appeal defendant argued that since he had already refused to answer any further questions it was improper under Miranda for the F.B.I. agent to question him and any statements given to him were inadmissible.

In affirming defendant's conviction the circuit court at page 513 of 391 F.2d says: "We do not agree with these contentions. It seems clear to us that what the Court sought to interdict in Miranda were those situations in which a person has indicated his desire to exercise his constitutional right of silence but the police refuse to take 'no' for an answer. Disregarding his constitutional claim, they continue to ask questions, see 384 U.S. at 453, 86 S.Ct. 1602, 16 L.Ed.2d 694. These techniques were not used in this case. It is admitted that the local police ceased interrogation immediately upon appellant's expression of an unwillingness to proceed further."

In State v. Bishop, 272 N.C. 283, 158 S.E.2d 511, four codefendants appealed their convictions for breaking and entering and larceny on the ground certain inculpatory in-custody statements admitted into evidence constituted reversible error under Miranda.

Following arrest and apprisal of their constitutional rights each accused denied any knowledge of the crimes. Subsequent to further interrogation the next day they continued to maintain their innocence and stated they did not wish to answer further questions. Interrogation immediately ceased. The following day after reiteration of the Miranda warnings each defendant admitted complicity in the crimes. On trial these admissions were received in evidence over defendants' objections.

The record is similar to the case at bar in that the officers were careful to fully inform defendants of their constitutional rights prior to any interrogation. There was no evidence of physical or psychological intimidation of the sort condemned in Miranda.

At page 520, 158 S.E.2d, the court says: "We do not interpret the portion of the Miranda opinion now under consideration to mean that when a defendant is 'in custody' and has been duly advised of his constitutional rights, and he states that he does not want to make a statement at the first questioning, that law enforcement officers are forever barred from asking another question. We do interpret it to mean that when a defendant is being interrogated and he indicates that he wishes to remain silent, that interrogation must not then be continued. The vice sought to be removed is the evil of continued, incessant harrassment by interrogation which results in breaking the will of the suspect, thereby making his statement involuntary."

In State v. Godfrey, 182 Neb. 451, 155 N.W.2d 438, defendant was arrested on suspicion of burglary and taken to the police station for questioning. After receiving his Miranda warnings defendant specifically stated he would answer no questions. The interrogation then ceased. About five hours later officers confronted defendant with some newly discovered evidence and after again giving him the Miranda warnings asked him if he wished to waive his rights. Defendant willingly waived his rights and voluntarily confessed to the crime. He had not requested the aid of counsel.

On appeal from conviction defendant argued his initial request to remain silent should have prevented any further in-custody interrogation of him by the police in the absence of a lawyer, and therefore rendered inadmissible his subsequent incriminating statements.

In rejecting this argument the court noted Miranda did not exclude purely volun-

tary statements and also noticed the interrogators' immediate cessation of questioning upon defendant's request was indicative of the fact "his interrogators are prepared to recognize his privilege should he choose to exercise it."

At pages 441, 442, 155 N.W.2d, the court states: "We recognize that the police cannot be permitted to attempt an in-custody interrogation and, upon being met with a refusal, return a prisoner to his cell and then attempt to repeat the procedure periodically until a statement is obtained. However, an otherwise valid voluntary waiver of both the right to counsel and the right to remain silent, knowingly and intelligently made, followed by a statement, should not be transformed into invalidity merely because of silence at some prior time. One refusal to make a statement, when that refusal is fully honored, ought not to taint the substance of the entire subsequent procedures under the circumstances here. * * *

"We hold that the fact that a defendant, as a part of the initial procedures at a police station, after full Miranda warnings, is asked whether he desires to make a statement at that time and answers negatively, does not automatically invoke his right to counsel and render inadmissible any subsequent statement obtained in the absence of counsel. Neither does such a factual circumstance, coupled with the other facts here, prohibit or invalidate a later waiver voluntarily, knowingly, and intelligently made."

In Mullaney v. State, 5 Md.App. 248, 246 A.2d 291, defendant was arrested for possession of marihuana. On the way to the police station after he had been given the Miranda warnings he made some incriminating statements which were later admitted into evidence at his trial. On appeal he contended these statements were inadmissible since the state had failed to demonstrate he had knowingly waived his rights.

In disposing of this contention the court employed what we believe to be both a practical and constitutionally permissible test for determining the voluntariness of incriminating statements given by a defendant after he has received his Miranda warnings.

At page 301, 246 A.2d the court says: "And equally plain from Miranda is the flat holding at pages 475 and 479, 86 S.Ct. at pages 1628 and 1630, 16 L.Ed.2d that no evidence obtained as a result of a custodial interrogation can be used against an accused unless and until the prosecution demonstrates a waiver of constitutional rights within the meaning of Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 [146 A.L.R. 357], a case which holds that waiver of a fundamental constitutional right is ordinarily 'an intentional relinquishment or abandonment of a known right or privilege', the determination of which 'must depend in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused'. * * * Despite the fact that the testimony does not show an express waiver of appellant's right to remain silent and to counsel, we hold that the totality of the circumstances—the attendant facts of the case—are such as implicitly show that appellant voluntarily and intelligently relinquished these rights when he made his incriminating admissions."

In Narro v. United States, 5 Cir., 370 F.2d 329, defendant was arrested and convicted for stealing and possessing an unemployment compensation check. On appeal she asserted her signed written confession was inadmissible because the prosecution had failed to demonstrate she had knowingly waived her Miranda rights.

In affirming her conviction the court said: "Thus the cases in which it is clear that the warnings have been given must be considered on their own facts in order to determine the question of waiver. The courts must do this on an ad hoc basis;

since no per se rule has thus far been adopted dealing with this problem. The evidence here seems ample to warrant the conclusion that the appellant freely and voluntarily gave her statement after having been made fully aware of her rights by both the Commission and the investigating officers." Pages 329, 330, 370 F.2d.

In United States v. Hayes, 4 Cir., 385 F.2d 375, defendant was convicted for transporting falsely made checks in interstate commerce. His sole contention on appeal was that certain incriminating statements elicited from him after receiving his Miranda warnings were obtained in contravention of his constitutional rights in that the prosecution had failed to demonstrate an intelligent and knowing waiver of his rights.

In affirming defendant's conviction the Circuit Court relied on the reasoning of the Narro case, supra, and said at page 378, 385 F.2d: "Miranda admonishes: 'The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant.' * * * We simply decide today that strong and unmistakable circumstances, upon occasion, may satisfactorily establish such an equivalent." Similar reasoning is applied in United States v. Hall, 4 Cir., 396 F.2d 841.

■ We hold that when the totality of the facts—the attendant circumstances—are strong in clearly demonstrating the wholly voluntary nature of defendant's incriminating statements, such statements are admissible in evidence, even though he may have previously invoked his right to remain silent. Accordingly, it was not error, in view of the attendant circumstances of this case, to admit the statements made to officers Novy and Herrick.

II. Defendant asserts the admissions made to Novy and Herrick were the product of his previous admissions to Car-

rick and Curd and hence inadmissible on the ground defendant had not at that time been adequately apprised of his Miranda warnings. His argument is apparently premised on the fruit of the poisonous tree doctrine as discussed by the Supreme Court in Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 and Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441, to which defendant has cited us.

Laying aside the fact that both Nardone and Wong Sun were concerned with Fourth Amendment rights, and therefore not persuasive authority for defendant's claim he has been denied rights guaranteed him under the Fifth Amendment, we are still not persuaded his argument has merit.

The Supreme Court has never specifically extended the poisonous or tainted fruit theory to Fifth Amendment rights. We are, however, aware of and have closely studied Westover v. United States, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, a companion case of Miranda, wherein the court reversed defendant's conviction on reasoning very similar to that previously employed by the court in dealing with Fourth Amendment violations and the tainted fruit doctrine.

■ It is sufficient to say the case at bar is not comparable factually to Westover where defendant was interrogated at length over a fourteen hour period by local officers with no showing he had been warned of his rights and immediately thereafter questioned by F.B.I. agents who obtained admissions from him. On the facts before us defendant's statements to Novy and Herrick were sufficiently removed both in time and place to render them free of any taint which may have been attached to his earlier admissions. This conclusion finds support in Commonwealth v. Moody, 429 Pa. 39, 239 A.2d 409; Evans v. United States, 8 Cir., 375 F.2d 355.

■ III. Defendant argues he was denied due process of law in that he was not

promptly taken before a magistrate. This contention was not specifically raised in the lower court. The trial court did not rule on the point, nor did defendant request such a ruling. The officers were having a busy law enforcement period during the early morning hours of the day defendant was taken into custody. The record does not reveal when defendant was taken before a magistrate. We must adhere to our established rule that issues not raised in the trial court will not ordinarily be considered for the first time on appeal. State v. Ford, 259 Iowa 744, 751, 145 N.W. 2d 638, 642; State v. Hardesty, 261 Iowa 382, 153 N.W.2d 464, 469; State v. Miskell, Iowa, 161 N.W.2d 732, 735.

■ IV. In like manner defendant now urges for the first time he was denied due process in that he was denied his right to make a telephone call in violation of section 755.17, Code, 1966. This contention was not specifically raised in the trial court. The trial court did not rule on this claim nor was it requested to do so. The authorities cited, supra, are likewise dispositive of this contention. Additionally, we must point out defendant was advised of his right to make a telephone call and did not choose to exercise it.

V. Defendant claims there was insufficient evidence to support the verdict. He was charged with breaking and entering the Bruce Supply Store of Adair, Iowa with intent to commit a public offense, to wit: larceny of the property of Bruce Schwenneker, its owner.

■ On appeal by defendant based on claimed insufficiency of evidence to support a conviction, we view the evidence in the light most favorable to the State. State v. Frink, 255 Iowa 59, 64, 120 N.W.2d 432, 435; State v. Allnutt, Iowa, 156 N.W.2d 266, 267; State v. Anderson, Iowa, 159 N.W.2d 809, 812.

■ The quality of evidence necessary to convict, whether it be circumstantial or direct, must be sufficient to raise a fair

inference of guilt. It must generate something more than suspicion, speculation or conjecture. State v. Myers, 253 Iowa 271, 274, 111 N.W.2d 660, 662; State v. Daves, 259 Iowa 584, 586, 144 N.W.2d 879, 881.

■ In a criminal case, however, the cause should be submitted to the jury and the court should not direct a verdict of acquittal if there is any substantial evidence reasonably tending to support the charge. State v. Miskell, 247 Iowa 678, 686, 73 N.W.2d 36, 41; State v. Horrell, 260 Iowa 945, 151 N.W.2d 526, 529.

■ In addition to the evidence we have already referred to, the record discloses the owner of Bruce Supply Store, Mr. Schwenneker, and his wife testified as to ownership and the east door was closed and locked a few hours before defendant's arrest. The sheriff testified the pry marks where the door had been forced open matched the width of the pry bar taken from defendant. Defendant testified he was in Chafa's car shortly before his arrest. The evidence was more than sufficient to raise a fair inference of defendant's guilt. He was not entitled to a directed verdict.

VI. Defendant argues the trial court erred in submitting instruction 7, which defined public offense, in conjunction with instructions 9 and 10, which detailed the elements necessary to sustain a guilty verdict and defined larceny. He alleges "two unreconcilable issues were tendered by this and that the jury could pick either." We do not agree.

■ A public offense, per se, is not an indictable offense under any of our statutes. It is merely a definitional term encompassing a wide variety of specific crimes to which the state attaches a penalty for the infraction thereof.

■ Of course, the instructions must be taken and considered together. State v. Shipley, 259 Iowa 952, 957, 146 N.W.2d 266, 269; State v. Hardesty, 261 Iowa 382, 153 N.W.2d 464, 471. When so read we find

there is no merit in defendant's contention the instructions submitted two unreconcilable issues.

VII. Defendant next argues the trial court erred in failing "to instruct the jury that the element of 'with intent to commit a public offense, to wit: larceny' was a fact to be proven beyond a reasonable doubt and not to be presumed from defendant's presence in the store."

 It is elemental the state had the burden of proving defendant guilty beyond a reasonable doubt of the crime charged. Instruction 9 specifically so instructed the jury. The trial court therein set out six elements which the state was required to prove beyond a reasonable doubt. The second element so listed stated: "That the breaking and entering was done with the intent to commit a public offense, to wit: larceny." We cannot agree the trial court did not adequately instruct the jury on this burden.

 VIII. Lastly, defendant contends the trial court erred in giving instruction 12. It reads: "Under our law a person charged with a crime may testify in his own behalf, and the defendant has availed himself of this privilege, and in determining the question of his guilt or innocence you must consider his testimony.

"He testified as an interested witness, and from an interested standpoint, and as such you should consider his testimony; and when you do this, with all of the surrounding circumstances in the case, give the testimony such weight, in connection with the other evidence in the case, as you think it entitled to receive."

In two recent opinions we have pointedly suggested an instruction calling the jury's attention to defendant as an interested witness should not be given. State v. Alford, Iowa, 151 N.W.2d 573, 575, 576; State v. Allnutt, Iowa, 156 N.W.2d 266, 272, 273. We repeat our admonition here. However, the trial of this case began on February 20, 1967 before the opinions in either of the two cited cases. We find no reversible error in the giving of instruction 12.

Having found no reversible error, the judgment must be affirmed.

Affirmed.

GARFIELD, C. J., and LARSON, SNELL and LeGRAND, JJ., concur.

STUART, J., concurs in the result.

BECKER, MASON and RAWLINGS, JJ., dissent.

BECKER, Justice.

I dissent.

Reversible error occurred when the testimony of Patrolman Novy, relating to admissions made by defendant, was admitted into evidence.

We should first review the essential facts under which the admissions to Patrolman Novy were made. At the time of the interrogation the following facts appear from the record made by the State:

1. Defendant had been arrested at 2:00 A.M.

2. Defendant had been held in custody at a DX filling station in the town of Adair for four hours.

3. Defendant had been given the Miranda warnings at 3:20 A.M.

4. Immediately upon receiving the Miranda warning defendant exercised his right against self-incrimination and stated he did not want to talk to the sheriff who read the warning to him.

5. Defendant was not questioned further by the sheriff but was handcuffed. He remained handcuffed to and during his ride in the patrol car where further questioning took place.

6. Defendant was being transported to the county jail in a patrol car when questioned at about 6:00 A.M. by Patrolman Novy. Officer Novy was driving, defendant sat at his right. In the back seat were Chafa, also handcuffed and Deputy Sheriff Herrick.

7. There is no record of further warnings to defendant by the patrolman or anyone else.

8. The patrolman initiated the questioning.

9. Defendant answered the patrolman's questions.

10. There is no evidence of duress other than defendant being in custody and handcuffed.

11. There is no record of voluntary waiver of constitutional rights by defendant.

I. This is not a case of whether defendant received adequate warnings under the rules laid down in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. It is a case of whether the State proved a waiver of defendant's previously exercised right to remain silent. Miranda v. Arizona states at page 475 of 384 U.S. 436, page 1628 of 86 S.Ct.: "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. State of Illinois, 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977, 986. This Court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357 (1938), and we re-assert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.

"An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. A statement we made in Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70, 77 (1962), is applicable here:

" 'Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.'

"See also Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Moreover, where in-custody interrogation is involved, there is no room for the contention that the privilege is waived if the individual answers some questions or gives some information on his own prior to invoking his right to remain silent when interrogated."

The majority accepts the Maryland philosophy [1] cited at Division I, "despite the fact that the testimony does not show an express waiver of appellant's right to remain silent and to counsel, we hold that the totality of the circumstances—the attendant facts of the case—are such as implicitly show that appellant voluntarily and intelligently relinquished these rights when he made his incriminating admissions." Whatever may have been the result of the Maryland case, under the facts before that court, the acceptance of such

---

1. Mullaney v. State, 5 Md.App. 248, 246 A.2d 291.

a holding under the facts of this case constitutes refusal to follow the mandate of the Supreme Court of the United States on a federal constitutional issue.

This is true because there are no facts which point to an intelligent waiver of the previously asserted right to remain silent. A short opinion of the United States Court of Appeals (9 Cir.), Moore v. U. S., 401 F.2d 533 fits our situation exactly: "Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires the government to show not only that the accused was effectively informed of his privilege against self-incrimination and his right to the assistance of counsel, but also that the accused knowingly and intelligently waived these rights. Moreover, 'A valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.' 384 U.S. at 475, 86 S. Ct. at 1628.

*"The record is devoid of any evidence that appellant waived his rights before making the admissions to which Officer Pelz testified.* (Emphasis supplied.)

"Since we cannot say that the error 'does not affect substantial rights' (Fed. R.Crim.P. 52(a)), or 'that it was harmless beyond a reasonable doubt' (Chapman v. State of California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), the judgment must be reversed."

This is the entire opinion. It is enough. To hold otherwise here is to reject the principle of federal pre-eminence in federal constitutional law fields, a cornerstone of our national form of government.

The refusal of this court, and most other state appellate courts, to follow the Miranda decision flows in large part from the refusal to recognize that the voluntary character of the statement is no longer the sole test of its admissibility. There are now two standards: the United States constitutional tests as delineated by the United States Supreme Court *and* the voluntary character of the statement. When we merge the two standards and treat them as one we ultimately make the decision based on pre-Miranda standards.

Basically Moore v. U. S., supra, recognizes this distinction by reversing the case without inquiry into the voluntariness of the statement. Such inquiry is immaterial if the standards of Miranda have not been met. Such is the case here.

II. The fundamental principle that United States Supreme Court rulings are binding in State courts in matters of federal constitutional law has been repeatedly recognized by this court. State v. Kelly, 249 Iowa 1219, 91 N.W.2d 562; State v. Karston, 247 Iowa 32, 72 N.W.2d 463. When we ignore the binding authority of such rules we come perilously close to affirming the principle that the State may violate its own laws to achieve its immediate objective.

We have tried to move away from such dangers as are inherent in the philosophy accepted in State v. Tonn, 195 Iowa 94, 191 N.W. 530. There we held evidence acquired by the illegal or even criminal acts of state agents was nevertheless admissible in evidence. This flaunting of all of the basic concepts of our government was not corrected until Mapp v. Ohio, 367 U.S. 433, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933, was decided. Happily in State v. Hagen, 258 Iowa 196, 137 N.W. 2d 895, we treated Mapp v. Ohio, supra, as binding on us. The false principle of State v. Tonn, supra, was thus abandoned.

We now face essentially the same question. Shall we condone and approve a clear and known violation of a fundamental constitutional right in order to sustain a conviction that we think correct? In State v. Tonn, supra, the answer was affirmative but not without dissent.

Justice Weaver observed in part: "It seems little less than solemn mockery for us to protest our devotion to the 'sacred

constitutional right,' or virtuous purpose to rigidly enforce it and in the same breath declare our approval of the admission of 'evidence without any inquiry as to how that evidence was obtained.' The principle so involved finds a suggestive parallel in the case of the candidate for office who maintains his equipoise on the question of prohibition by declaring himself in favor of the law, but opposed to its enforcement. The suggestion that the person whose rights are invaded by a wrongful search or seizure has his remedy in an action for damages against the individual committing the trespass is scarcely worthy of the court which refuses to give him protection to which he is entitled under the charter which is supposed to command the obedience of the judiciary as well as of the private citizen. It is this growing disregard of fundamental rights and orderly methods of justice, which has given rise to the infamies of the so-called 'sweat box' and 'third degree' practices which cast discredit upon our professions of loyalty to law." (loc. cit. 195 Iowa at page 119–120, 191 N.W. at page 540.)

Chief Justice Preston wrote a separate dissent, part of which reads: "Other reasons occur to me why it seems to me that the majority opinion ought not to be adopted, but those stated will suffice for present purposes. After the Declaration of Independence, the Articles of Confederation, the adoption of the Constitution, and the separation from the mother country was complete, it was found necessary, under conditions then existing, that the people— innocent people—all the people, should be protected from the then existing encroachments of the government, or rather, the overzeal of its officers; and so for that reason and purpose the first ten amendments were proposed by Congress to the Legislatures of the several states, and they were ratified. This was in 1789. For 134 years until now, the protection guaranteed by the Constitution has meant something more than a 'form of words.' I would continue the protection, and follow the rule of the Supreme Court of the United States that evidence secured by an unlawful search or seizure, as here, is incompetent, where a petition or application is made * * * to return the property. * * *.

"It is said that enforcement of criminal law would be handicapped by a strict adherence to the rule contended for: that is to say, if the Constitution is adhered to, upheld, and defended, such would be the result. That may be so in some cases; but I submit that is not a sufficient answer. It should not be forgotten that the rights and interests of innocent people, guilty of no crime, are at stake." (loc. cit. 195 Iowa at page 131, 191 N.W. at page 545.)

These two dissents, written 45 years ago, are admirably prophetic when read in light of our current struggle to balance the needs of society against our ancestors' bold assertion that the State exists to serve the individual and the individual does indeed have certain inalienable rights which the State, regardless of need, cannot violate.

III. The majority cites three cases which are closely analogous to this case with one important exception. The exception is determinative, Jennings v. United States, 391 F.2d 512, (5 Cir.); State v. Godfrey, 182 Neb. 451, 155 N.W.2d 438 and State v. Bishop, 272 N.C. 283, 158 S.E.2d 511. All involve evidence of admissions obtained from defendants after the Miranda warnings had been given, defendants had exercised their right to remain silent, a period of time elapsed, defendants were again questioned and statements were elicited from them. The three cases are identical to this case except that in each and all of the three cases the Miranda warnings were again given before the subsequent questioning was started, and in two cases there was evidence defendants, immediately prior to the subsequent questioning, affirmatively waived their right to remain silent.

None of the three cases support the result reached here because in each of those

cases the State had affirmative evidence to sustain its burden to show a voluntary relinquishment of a known right.

IV. Division VIII of the majority opinion again frowns on the instruction calling the jury's attention to defendant as an interested witness. We should now clearly state the giving of such an instruction is reversible error. See dissent in State v. Ford, 259 Iowa 744, 755, 145 N.W.2d 638.

This case should be reversed for retrial on legally admissible evidence. Only by such action do we abide by our own rules.

MASON and RAWLINGS, JJ., join in this dissent.